**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Baltimore Division**

| | |
|---|---|
| KEIRA WILLIAMS,<br>5215 Garmouth Road<br>Baltimore, MD 21229<br>(Baltimore City) | Civil Action No. 1:26-cv-01678 |
| CASEY COOK,<br>1901 Connecticut Ave NW, Apt. 209<br>Washington, D.C. 20009 | |
| LEROY CARDONA,<br>1790 W. Picacho Ave, Apt. 2<br>Las Cruces, N.M. 88005 | |
| ZACHARY MILES,<br>2011 Grove Street<br>Jacksonville Beach, FL 32250 | |
| JULIAN GRIFFIN,<br>4072 Biltmore Avenue<br>Tallahassee, FL 32311 | |
| NIA JOHNSON,<br>235 Haas Avenue, Apt. 301<br>San Leandro, CA 94577 | |
| TWESHA PATEL,<br>4499 Ohio Street, Apt. 349<br>San Diego, CA 92126 | |
| JEFFREY MOFFITT,<br>180 3rd Street<br>Waukee, Iowa 50263 | |
| SCOTT ELLIOTT,<br>2324 Swart Road<br>Albany, OH 45710 | |
| JACOB BUTE,<br>2328 E. Finley Street<br>Gilbert, AZ 85296 | |

JOSEPHINE GORRUSO,
4993 Dawhoo Road
Hollywood, SC 29449

JERRY RICE,
121 Camden Drive
Greenville, SC 29673

MARIO COCHRAN,
5635 Hawksbury Creek Trail
Katy, TX 77449

*and*

SHARON VOSS,
1855 W Wickenburg Way, Lot 63
Wickenburg, AZ 85390

*on behalf of themselves and all individuals similarly situated,*

                              Plaintiffs,

v.

FLAMAN MCCLOUD, JR.,
2726 Mission Rancheria Road
Lakeport, CA 95453

NICK JACK,
2726 Mission Rancheria Road
Lakeport, CA 95453

ALIYA PONCE,
2726 Mission Rancheria Road
Lakeport, CA 95453

VIVIAN MCCLOUD,
2726 Mission Rancheria Road
Lakeport, CA 95453

*and*

JOHN DOES 1-25,

                              Defendants.

2

## CLASS ACTION COMPLAINT

Plaintiffs Keira Williams, Casey Cook, Leroy Cardona, Zachary Miles, Julian Griffin, Nia Johnson, Twesha Patel, Jeffrey Moffitt, Scott Elliott, Jacob Bute, Josephine Gorruso, Jerry Rice, Mario Cochran, and Sharon Voss ("Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendants, allege as follows:

## INTRODUCTION

1.      This case arises from the making and collection of unlawful loans from online lending entities *purportedly* owned and operated by the Big Valley Band of Pomo Indians (the "Tribe"), a federally recognized Native American tribe. These loans impose triple-digit interest rates, exponentially higher than the interest rate cap permitted by laws in nearly every state.

2.      For example, Maryland law caps the interest rate on consumer loans issued to its residents, including Plaintiff Keira Williams, at 33 percent. Md. Code, Com. § 12-306. Moreover, no person may make a loan under Maryland's Consumer Loan Law without a license issued by the Maryland Commissioner of Financial Regulation. Md. Code, Com. Law § 12-302; Md. Code, Fin. Inst. § 11-204. Because the online entities in this case failed to obtain a license, they "may not receive or retain any principal, interest, or other compensation with respect to any loan[.]" Md. Code, Com. Law § 12-314.

3.      Despite these explicit limitations and requirements enacted to protect Maryland residents, Defendants knowingly established, funded, operated, and underwrote several lending entities that issued and collected loans from Maryland consumers without a license from the Commissioner of Financial Regulation and with triple-digit interest rates, including an August

2025 loan issued to Plaintiff Keira Williams with an ***interest rate of 795%***—more than ***24 times*** Maryland's usury limit.

4. The loans issued by Defendants' usurious scheme are similarly illegal in the District of Columbia, New Mexico, Florida, California, Iowa, Ohio, Arizona, South Carolina, Texas, and Arizona—the states in which Plaintiffs Cook, Cardona, Miles, Johnson, Moffitt, Elliott, Bute, Gorruso, Cochran, and Voss resided when they obtained their loans.

5. Seeking to ostensibly avoid state usury laws, Defendants established what is commonly referred to as a tribal lending business model—"the most recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012). Under this model, non-tribal payday lenders originate their loan products through a company "owned" by a Native American tribe and organized under its laws. The tribal company serves as a conduit for the loans, facilitating a dubious and legally incorrect claim that the loans are subject to tribal law, not the protections created by state usury and licensing laws. In exchange for the use of its name on the loan, the tribal company often receives only a small portion of the revenue and does not meaningfully participate in the day-to-day operations of the business.

6. And regardless of the tribe's level of participation in the operations the loans are illegal because it is well settled that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973). In other words, as explained by the Fourth Circuit, "substantive state law applies to off-reservation conduct," such as the online loans marketed, collected, and paid by consumers in

Maryland and other states here. *Hengle v. Treppa*, 19 F.4th 324, 348 (4th Cir. 2021). And "although the Tribe itself cannot be sued for its commercial activities," its members, officers, and business partners "can be." *Id*.

7.    Despite the overwhelming authority regarding the illegality of these loan products, Defendants made, collected, and/or received interest from high-interest loans originated in the names of Layma d/b/a Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders (the "Tribal Lending Entities" or "TLEs")—four entities formed under tribal law to serve as fronts in a now-debunked attempt to evade state usury protections.

8.    Upon information and belief and based on discovery in countless other tribal lending cases brought by Plaintiffs' counsel, despite the ostensive connection to the Tribe, non-tribal members handle significant parts of the TLEs' operations and provide the capital used to make the entities' loans. In return, these non-tribal coconspirators receive the vast majority of the profits of the illegal lending enterprise.

9.    Defendants Flaman McCloud, Jr., Nick Jack, Aliya Ponce, and Vivian McCloud (the "Tribal Council Defendants") are members of the Big Valley Band of Pomo Indians Tribal Council. Although they may be motivated by their intention of advancing their own community, their effort to advance themselves exploits desperately poor people in other communities who, in their moment of despair, agree to take a small dollar loan with triple-digit interest rates. The Tribal Council members' consent, authorization, and participation is a necessary component of the illegal lending enterprise and, thus, is instrumental in facilitating the creation of the illegal loans.

10.   In addition to the Tribal Council Defendants, Plaintiffs also seek relief from a group of yet-to-be-identified coconspirators—the John Doe Defendants—whose identities will be revealed through discovery into the TLEs' operations.  Upon information and belief, and based on

discovery in other tribal lending cases, the John Doe Defendants are non-tribal individuals who run the day-to-day operations of the Lending Entities, including funding, underwriting, operating, staffing, and servicing the loans issued by each entity.  They also reap the vast majority of benefits from the TLEs' operations.

11.     Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, which was expressly enacted "to seek the eradication of organized crime in the United States," including loan sharking. Pub. L. 91–452; *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 839 (4th Cir. 1990) (explaining that RICO "makes it unlawful for 'any person'—not just mobsters—to use money derived from [the unlawful collection of debt] to invest in an enterprise, to acquire control of an enterprise through [the unlawful collection of debt], or to conduct an enterprise through the [unlawful collection of debt].").

12.     Plaintiffs also assert a class claim for violations of state usury and consumer protection laws, seeking to enjoin the Tribal Council Defendants, in the official capacities through which they control and sanction the TLEs' operations, from allowing the further collection of the unlawful and void loans.

13.     And Plaintiffs seek declaratory relief that their loans are void and unenforceable under the laws of their respective states and every other state in which the loans are usurious and thus void under each state's applicable law.

## JURISDICTION

14.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

15.    The Court also has jurisdiction over Plaintiffs' state law claims under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because there are members of the classes defined below that are citizens of different states from any defendant and the amount in controversy, in the aggregate, exceeds $5,000,000, exclusive of interest and costs.

16.    Indeed, in every tribal lending case brought by Plaintiff's counsel, the amounts in controversy have far exceeded $5 million, as the amount of the loans often reach into the hundreds of millions and even billions of dollars. *See, e.g.*, *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dec. 17, 2024 Final Approval Order, Dkt. 201 (granting final approval of class settlement providing $1.4 billion in debt cancellation and common fund of $37 million); *Hengle v. Asner,* No. 3:19-cv-250, Final Approval Order at Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order at Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final Approval Order at Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Final Approval Order at Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million).

17.    Upon information and belief, and based on discovery in every other tribal lending case to date, the outstanding balances of the loans issued by even one of the TLEs in this case—

including, for example, Little Lake—far exceeds $5 million, especially when considering the millions in additional interest allegedly owed on the triple-digit loans. Even with respect to the individual states, moreover, Plaintiffs allege and believe based upon their prior cases the outstanding balances of the loans issued by any one of the TLEs in just one of the states in which they operate exceeds $5 million in the aggregate, especially when including the additional interest.

18.    The state law counts in this case seek to enjoin further collection of these outstanding balances and, thus, the measure of the amount in controversy (i.e., the value of the injunctive relief) is at least as much as the outstanding balances on the loans issued by the TLEs in each respective state. The Court therefore has jurisdiction over the state law counts under CAFA, notwithstanding their RICO claims.

19.    Venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants have transacted their affairs in Maryland, including the making and collection of loans to likely thousands of residents in Maryland. Additionally, venue is also proper in this Court pursuant to 28 U.S.C. § 1965(b) because Plaintiff Williams is a resident of this District and Division and a substantial part of her claims occurred in Maryland.

## **PARTIES**

20.    Plaintiff Keira Williams ("Williams") is a natural person and resident of this Division and District.

21.    Plaintiff Casey Cook ("Cook") is a natural person and resident of the District of Columbia.

22.    Plaintiff Leroy Cardona ("Cardona") is a natural person and resident of New Mexico.

23.    Plaintiff Zachary Miles ("Miles") is a natural person and resident of Florida.

24.     Plaintiff Julian Griffin ("Griffin") is a natural person and resident of Florida.

25.     Plaintiff Nia Johnson ("Johnson") is a natural person and resident of California.

26.     Plaintiff Twesha Patel ("Patel") is a natural person and resident of California.

27.     Plaintiff Jeffrey Moffitt ("Moffitt") is a natural person and resident of Iowa.

28.     Plaintiff Scott Elliott ("Elliott") is a natural person and resident of Ohio.

29.     Plaintiff Jacob Bute ("Bute") is a natural person and resident of Arizona.

30.     Plaintiff Josephine Gorruso ("Gorruso") is a natural person and resident of South Carolina.

31.     Plaintiff Jerry Rice ("Rice") is a natural person and resident of South Carolina.

32.     Plaintiff Mario Cochran ("Cochran") is a natural person and resident of Texas.

33.     Plaintiff Sharon Voss ("Voss") is a natural person and resident of Arizona.

34.     Defendant Flaman McCloud, Jr. ("McCloud, Jr.") is the Chairman of the Tribal Council of the Big Valley Band of Pomo Indians. As Chairman, Defendant McCloud, Jr.'s duties include the chartering and oversight of Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders.[1] In performing these duties, Defendant McCloud, Jr. meets regularly with other members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation of each entity; the appointment and removal of the board members of the Entities; and approval of agreements between each entity and nontribal coconspirators. Based on the misconduct alleged herein, Plaintiffs seeks an injunction and declaratory relief against Chairman McCloud, Jr., in his official capacity, as well

---

[1] Although the tribal lending entities claim may be  entitled to immunity, the Supreme Court has held that "tribal immunity does not bar" a "suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). Tribal sovereign immunity is also "simply not in play" when a person seeks recovery from a tribal employee in his or her individual capacity—even when the wrongful conduct was within the scope of tribal employment. *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017).

as damages from him in his individual capacity. *See Fitzgerald v. Wildcat*, 687 F. Supp. 3d 756, 779 (W.D. Va. 2023) (explaining that sovereign immunity did not bar claims because "Plaintiffs seek damages for their RICO claims against the Tribal Council and Tribal Employee Defendants, in their individual capacities, based on loans issued online to them when they were located on non-tribal lands. They do not seek relief from the Tribal treasury, nor do they seek to interfere with the Tribe's self-governance or authority.").

35. Defendant Nick Jack is the Vice Chairman of the Tribal Council of the Big Valley Band of Pomo Indians. As Vice Chairman, Defendant Jack's duties include the chartering and oversight of Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders. In performing these duties, Defendant Jack meets regularly with other members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation of each entity; the appointment and removal of the board members of the Entities; and approval of agreements between each entity and nontribal coconspirators. Based on the misconduct alleged herein, Plaintiffs seeks an injunction and declaratory relief against Vice Chairman Nick Jack in his official capacity, as well as damages from him in his individual capacity.

36. Defendant Aliya Ponce is the Treasurer of the Tribal Council of the Big Valley Band of Pomo Indians. As Treasurer, Defendant Ponce's duties include the chartering and oversight of Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders. In performing these duties, Defendant Ponce meets regularly with other members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation of each entity; the appointment and removal of the board members of the Entities; and approval of agreements between each entity and nontribal coconspirators. Based on

the misconduct alleged herein, Plaintiffs seeks an injunction and declaratory relief against Treasurer Ponce in her official capacity, as well as damages from her in her individual capacity.

37.     Defendant Vivian McCloud is the Secretary of the Tribal Council of the Big Valley Band of Pomo Indians. As Secretary, Defendant McCloud's duties include the chartering and oversight of Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders. In performing these duties, Defendant McCloud meets regularly with other members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation of each entity; the appointment and removal of the board members of the Entities; and approval of agreements between each entity and nontribal coconspirators. Based on the misconduct alleged herein, Plaintiffs seeks an injunction against Secretary McCloud in her official capacity, as well as damages from her in her individual capacity.

38.     Defendant John Doe Nos. 1-25 are unidentified parties who participated in the enterprise with the Defendants, including but not limited to entities and individuals who aided, abetted, and facilitated the conspiracy to collect the unlawful amounts from consumers.

### FACTUAL BACKGROUND AND ALLEGATIONS

**A.      State usury and licensing laws protect consumers from usurious loans.**

39.     "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

40.     Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders.

11

**i.    Maryland**

41.    By way of example, Maryland law "caps the interest rate at 33% on all loans below $6,000." *CashCall, Inc. v. Maryland Com'r of Fin. Regul.*, 448 Md. 412, 418 (2016) (citing Md. Code, Com. Law §§ 12–306, 12–313, and 12–314).

42.    For more than a century, Maryland law has further required any person engaged "in the business of making loans" to be licensed or exempt from licensing. Md. Code, Com. Law § 12-302; *see also Nagle & Zaller, P.C. v. Delegall*, 480 Md. 274, 303 (2022) ("Maryland's licensing requirements for lenders of loans dates to a 1912 Act, which, among other things, required licensing of "petty loan brokers," capped certain fees depending on the amount borrowed, and mandated disclosure of the loan's terms to the borrower.").

43.    When Maryland's General Assembly replaced the original version of the statute in 1918, the "preamble to that law declared that: 'The conduct of [the business of making small loans] has long been the cause of general complaint, and of much hardship and injustice to borrowers, and there is no regulation or provisions of law which has proved effective for the protection of such borrowers and for the punishment of usurious money lenders ... and there is a real need for the enactment of a law that will enable [the] continuance [of small loan lending] under proper supervision[.]'" *Nagle & Zaller*, 480 Md. at 304 (quoting Ch. 88, 1918 Md. Laws 197, 197-198).

44.    In describing the purpose for the statute, the Court of Appeals of Maryland has noted that "[c]ountless instances illustrate the oppression and injustice wrought upon small needy borrowers by the callous and cruel greed so often found in the class engaged in the business of lending money in small amounts to those who have little to offer as security[.]" *Liberty Fin. Co., Inc. v. Catterton*, 161 Md. 650, 654, 158 A. 16 (1932).

45.    The court further added: "It was to mitigate rather than eradicate the evils incident to the business and to afford to the borrower the greatest practicable measure of protection that the act was passed." *Id*. at 18.

46.    Loans for less than $25,000 issued in violation of Maryland's usury limits or without a license is deemed "void and unenforceable." Md. Code, Com. L. § 13-314(b). And no person may "receive or retain any principal, interest, fees, or other compensation with respect to any loan that is void and unenforceable under this subsection." *Id.* § 13-314(b)(2).

47.    Maryland law is also explicit that for small-dollar loans the usury and licensing requirements "appl[y] to all loans made by a lender domicilied in another state to a borrower who is a resident of this State if the application for the loan originated in this State." *Id.* § 13-314(c)(3).

48.    And Maryland law prohibits lenders of usurious or unlicensed small-dollar loans—like those issued to Plaintiffs and the putative class members in this case—from collecting or attempting to collect any amounts on the unlawful loans, or from selling or assigning the same to another person. *Id.* § 13-314(d).

**ii.    District of Columbia**

49.    Similarly, in the District of Columbia, where Plaintiff Cook resided at the time she obtained a loan from Little Lake, parties cannot contract for the "payment of interest on the principal amount thereof at a rate not exceeding 24% per annum." D.C. Code Ann. § 28-3301.

50.    Any person who takes or receives a greater amount of interest than is lawfully allowed owes the payor of such interest all amounts so paid. D.C. Code Ann. § 28-3304. Amounts paid are also automatically credited to the principal balance as if no interest were owed. *Id.* § 28-3305.

51.     A borrower of a usury loan has the right to seek her attorney's fees, actual and punitive damages, and any other relief deemed proper, including injunctive relief.  *Id.* § 28-3314.

### iii.     New Mexico

52.     Under New Mexico law, "no person, corporation or association, directly or indirectly, shall take, receive or charge any interest, discount or other advantage for the loan of money . . . except at the rates permitted in Sections 56-8-1 through 56-8-21 NMSA."  N.M. Stat. 56-8-9(A).

53.     Section 56-8-3, in turn, limits the lawful interest on money due by contract to 15% annually.

54.     In addition to this general interest rate cape, New Mexico law requires that loans issued in amounts of $5,000 or less "be made only pursuant to the New Mexico Bank Installment Loan Act of 1959."  N.M. Stat. § 56-8-9(F).  That Act limits the interest rate on small-dollar loans to 36% and imposes other requirements, such as a limit on the total number of installments that may be required.  *Id.* § 56-7-7(C) and (D).

55.     Those who willfully violate the New Mexico Bank Installment Loan Act of 1959 are guilty of a misdemeanor.  Additionally, any loan issued in violation of the Act is "void and the lender has no right to collect, receive or retain any interest or charges whatsoever" on the loan. And a loan issued in knowing violation of the Act is also void as to the principal amount of the loan, meaning no amounts may be collected.  *See* N.M. Stat. § 58-7-8(A).

56.     Violations of the Bank Installment Loan Act are also enforceable under New Mexico's Unfair Practices Act, N.M. Stat. § 57-12-2 *et seq.*, which permits any person likely to be damaged by an unfair trade practice to injunctive relief, regardless of monetary damage, and any person who suffers a monetary loss to recover their actual damages or a minimum of $100,

14

whichever is greater, for a non-willful violation, and three-times their actual damages or $300, whichever is greater, for a willful violation. *See* N.M. Stat. § 57-12-10.

**iv.      Florida**

57.      Florida has enacted usury laws that prohibit lenders from making high interest loans.

58.      The Florida legislature passed laws prohibiting usury as early as 1822, before Florida even became a state in 1845.[2] As the Florida Supreme Court noted, "The very purpose of statutes prohibiting usury is to bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in the making of loans." *Chandler v. Kendrick*, 146 So. 551, 552 (Fla. 1933).

59.      Pursuant to Florida Statute § 687.03, interest rates greater than 18% per annum on loans in the amount of $500,000 or less are usurious. Those who violate the usury provisions must forfeit "the entire interest so charged or contracted to be charged" and double the amount of usurious interest paid. Fla. Stat. § 687.04.

60.      Additionally, in Florida, lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Fla. Stat. § 516.02(1-2). Even with a license, a lender may not charge interest exceeding 30% on the first $3,000 of the principal amount, 24% on the part of the principal amount exceeding $3,000 and up to $4,000, and 18% on that part of the principal amount exceeding $4,000 and up to $25,000. Fla. Stat. § 516.031(1).

---

[2] *See* Jeremiah W. Blydenburgh, *A Treatise On The Law Of Usury; To Which Are Added, The Statutes Of Several States Relating To Interest Now In Force*, 172 (1844), *available at* https://books.google.com/books?id=6Fk9AAAAIAAJ&printsec=frontcover&source=gbs_ge_su mmary_r&cad=0#v=onepage&q&f=false.

61.     If a lender (licensed or unlicensed) charges interest greater than legally permitted, the loan is void and unenforceable. Fla. Stat. § 516.02(2)(c).

62.     Further, under Florida law, it is a criminal offense to make usurious loans at rates of 25% of higher. Fla. Stat. § 687.071. Loan contracts in excess of the 25% threshold triggering criminal liability for usury are similarly "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758–59 (Fla. 1935).

63.     The Florida Attorney General has made clear that payday loans and similar loans are subject to Florida's usury laws. Fla. AGO 2000-26 (Fla. A.G.), 2000 WL 543211.

**v.      California**

64.     Recognizing that "[u]sury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations," California, which was founded in 1850, has regulated maximum interest rates since 1872.  Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

65.     Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

66.     Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

67.     "California state law currently limits the amount collected on a loan to "twelve dollars upon one hundred dollars for one year," or 12 percent.  Cal. Civ. Code § 1916-2.  "Any

agreement or contract of any nature in conflict with [the interest rate cap] shall be null and void as to any agreement or stipulation therein contained to pay interest and no action at law to recover interest in any sum shall be maintained and the debt can not be declared due until the full period of time it was contracted for has elapsed." *Id.*

68.     Thus, "[a]n interest rate in excess of [12%] is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Dev. Acquisition Grp.*, 776 F. Supp. 2d at 1164 (citing Cal. Civ. Code § 1916-2).

69.     California law further provides that any person who pays any amount exceeding the interest-rate cap may recover "treble the amount of the money so paid or value delivered in violation of said [cap]." Cal. Civ. Code § 1916-3(a).

70.     California has also deemed the willful lending of usurious loans without a license a felony "punishable by imprisonment in the state prison for not more than five years or in the county jail for not more than one year." Cal. Civ. Code § 1916-3(b).

71.     In addition to abiding by California's usury cap, lenders issuing loans to California residents are also required to obtain a license under the California Financing Law. *See* Cal. Fin. Code §§ 22000*, et seq.*

72.     Even if licensed, moreover, a licensee is still limited in the interest rates it can charge based on the unpaid principal balance remaining. *See* Cal. Fin. Code § 22303 (setting, for example, a "two and one-half percent per month" rate maximum on "that part of the unpaid principal balance . . . up to, including, but not in excess of [$225]," while limiting the rate for the portion between $225 and $900 to 2 percent, and the rate for $900-$1,650 to 1.5 percent).

73.     Loans willfully issued by even unlicensed lenders in violation of these requirements are deemed "void" and "no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction."  Cal. Fin. Code § 22750.

74.     Those who willfully violate the licensing requirements are also subject to fines and imprisonment.  Cal. Fin. Code §§ 22753, 22780.

75.     California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'"  *Dev. Acquisition Grp.*, 776 F. Supp. 2d at 1166 (quoting *Fox v. Peck Iron & Metal Co.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

76.     Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq*., which prohibits unlawful, unfair, or deceptive business practices.  Cal. Bus. & Prof. Code § 17200.

**vi.     Iowa**

77.     Iowa law limits the lawful rate of interest to either 5% or, if agreed to in writing, the maximum allowable rate published by the superintendent of banking for the month in which the loan is issued.  Iowa Stat. § 535.2(1), (3).

78.     The maximum rate published by the superintendent of banking is "two percentage points above the monthly average ten-year constant maturity interest rate of the United States government notes and bonds as published by the federal reserve system for the calendar month second preceding the month during which the maximum rate based thereon will be effective, rounded to the nearest one-fourth of one percent."  *Id.* § 535.2(3)(a)(1).

79.     Iowa law prohibits any person from "directly or indirectly, receiv[ing] money or any other thing, or in any manner, any greater sum or value for the loan of money" than the maximum interest rate.  *Id.* § 535.4.

80.     Iowa establishes several penalties for lenders of usurious loans, including proscribing any collection of interest if the lender seeks enforcement of the loan in court, and a forfeiture of 8% of the principal remaining unpaid at the time of the judgment, which is to be paid by the lender to the State.  *Id.* § 535.5.

**viii.    Ohio**

81.     Ohio law limits the rate of interest of no more than 8% for loans like those issued to Plaintiffs here.  Ohio Rev. Code Ann. § 1343.01.

82.     All amounts paid in excess of the lawful rate are applied to principal, and the lender is entitled to only the principal remaining after these amounts are deducted.  *Id.* § 1343.04.

83.     Ohio law also provides that "[n]o person" shall engage in the business of issuing loans of $5,000 or less with interest above 8% without first obtaining a license.  Id. § 1321.02.

84.     Any loan for $5,000 or less issued without a license and that has an interest rate of more than 8% is deemed "void," and the "lender has no right to collect, receive, or retain any principal, interest, or charges" on the loan.  *Id.*

**ix.    Arizona**

85.     Arizona limits the interest rate on "any loan, indebtedness or obligation other than medical debt . . . [to] ten percent a year."  Ariz. Rev. Stat. Ann. § 44-1201(A)(2).

86.     Lenders who issue loans exceeding this amount must forfeit all interest, and borrowers are entitled to judgment for all amounts paid in excess of the usurious rate.  *Id.* §§ 44-1203, 1204.

**x.    South Carolina**

87.     The maximum allowable interest on a loan made to South Carolina consumers is 8.75%.  S.C. Code § 34-31-20.

88.     South Carolina's Consumer Finance Law also prohibits the lending of amounts of $7,500 or less without a license and in excess of the general interest rate.  S.C. Code § 34-29-20.

89.     Those who violate these requirements are guilty of a misdemeanor, and any loan issued by them is "void and the lender shall have no right to collect, receive or retain any principal, interest or charges whatsoever, except in the case of bona fide error."  *Id.* § 34-29-20(d)-(e).

**xi.     Texas**

90.     Texas limits the "maximum rate or amount of interest" on a loan to "10 percent a year except as otherwise provided by law."  Tex. Fin. Code § 302.001(b).

91.     Lenders who issue loans exceeding the legal rate must "refund the amount of the excess to the borrower" or otherwise credit it against the lawful amounts owed.  *Id.* § 302.101.

92.     Failure to refund or credit the usurious amount to a consumer loan renders the lender liable to the borrower for "the greater of: (1) three times the amount computed by subtracting the amount of interest allowed by law from the total amount of interest contracted for, charged, or received; or (2) $2,000 or 20 percent of the amount of principal, whichever is less."  *Id.* § 305.001(a); *see also id.* § 305.003.

93.     And if the interest charged and received by the lender on a consumer loan is more than twice the legal rate, the lender is liable for "the principal amount on which the interest is charged and received" and "the interest and all other amounts charged and received."  *Id.* § 305.002.

94.     Texas law also makes the lender liable for the borrower's attorney's fees.  *Id.* § 305.005.

### xii.    Other State Usury Laws.

95.    Each state of residence of the putative class members also has an interest rate cap and similar provisions to prevent the enforcement and collection of usurious debts.[3]

## B.    Overview of the Tribal Lending Model

96.    Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today*, 903 N.E.2d at 1060 (citing Peterson, *supra*, at 1116 n.13).

97.    Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially vulnerable consumers."[4] The collection of unlawful and usurious debt continues to be a major problem, in

---

[3] *See* Ala. Code § 8-8-1; Alaska Stat. § 45.45.010; Ariz. Rev. Stat. Ann. § 44-1201-1204; Ark. Const. Art. XIX § 13; Cal. Civ. Code §§ 1916-2, 1916-3; Cal. Fin. Code §§ 22750, 22753, 22780; Colo. Rev. Stat. §§ 5-2-201, 5-5-201; Conn. Gen. Stat. §§ 37-4, 36a-573; D.C. Code §§ 28-3301, 28-3302; 6 Del. Code § 2301; Fla. Stat. §§ 687.904, 516.02; O.C.G.A. §§ 7-3-1, et seq.; O.C.G.A. § 16-17-2, 16-17-3; Haw. Rev. Stat. § 478-2; Idaho Code § 28-22-104; 815 Ill. Comp. Stat. 205/4, 122/4-10; *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009); Iowa Stat. §§ 535.2-535.5; Kan. Stat. § 16-201; Ky. Rev. Stat. Ann. § 360.010; La. Stat. Ann. § 9:3500, *et seq.*; Mass. Gen. L. ch. 107 § 3, Mass. Gen. L. ch. 271 § 49; Me. Rev. Stat. tit. 9-B, § 432; Md. Const. art. III § 57, Md. Code, Com. Law § 12-103; Mich. Comp. Laws §§ 438.31, 438.32, 445.1854; Minn. Stat. § 334.01, et seq.; Miss. Code. § 75-17-1, et seq.; Mo. Ann. Stat. § 408.030(1); Mont. Code § 31-1-108; Neb. Rev. Stat. §§ 45-101.03, 45-102; N.H. Rev. Stat. § 336:1; N.J. Code §§ 31:1-1, 31:1-3; N.M. Stat. §§ 56-8-9, 56-8-3, 58-7-6, 58-7-8, 57-12-10; N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.R.S. § 99.040, 99.050; N.C. Gen. Stat. §§ 24-1, 24-1.1; N.D. Cent. Code §§ 47-14-05, 47-14-09; Ohio Rev. Code Ann. § 1343.01-1343.04; Okla. Stat. tit. 15 § 266; Or. Rev. Stat. § 82.010; 41 Penn. Stat. §§ 201-202; 6 R.I. Gen. Laws §§ 6-26-1, 6-26-2; S.C. Code § 37-10-106(1), 34-29-10, *et seq.*; S.D. Code § 54-3-1.1, *et seq.*; Tenn. Code §§ 47-14-103, 47-14-117; Tex. Fin. Code §§ 302.001, 305.001, 305.003; Va. Code § 6.2-303; Vt. Stat. tit. 9, § 41a; Wash. Rev. Code § 19.52.010; W. Va. Code § 47-6-5; Wis. Stat. § 138.04; Wyo. Stat. § 40-14-106.

[4] *See* CFPB, *CFPB Finalizes Rule To Stop Payday Debt Traps* (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank

part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

98.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

99.     It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

100.    Prior to the rent-a-tribe business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws.[5] Others, attempted to evade laws through claims that the loans were subject to the laws of a foreign country or state without any usury laws.

101.    In response to the crackdown on these arrangements, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. Martin & Schwartz, *supra* at 759.

---

account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

[5] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* 17–22 (2001), *available at* http://www.consumerfed.org/pdfs/paydayreport.pdf.

102.    For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

103.    Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id*.

104.    Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

105.    Often, at the other side of the table, were the attorneys at Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm/ (last visited on March 13, 2022); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 840 (E.D. Va. 2020) (detailing the role of Rosette in the origins of the tribal lending businesses).

106.    Rosette shared Callaway's erroneous legal opinion that loans made through tribal entities did not need to comply with state licensing and usury laws—even when the tribe received a nominal amount of the proceeds from the loans.

107.    Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

108.    Over the past several years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *Id*.[6]

109.    In addition, there have been multiple class actions and government enforcement actions that have cancelled billions of dollars of these illegal loans and returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *See Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dec. 17, 2024 Final Approval Order, Dkt. 201 (granting final approval of class settlement providing $1.4 billion in debt cancellation and common fund of $37 million); *Hengle v. Asner,* No. 3:19-cv-250, Final Approval Order at Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order at Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final Approval Order at Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement

---

[6] *See also, e.g.*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 793 S.E.2d 357, 366 (Ga. 2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, , 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Final Approval Order at Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million).

110.    Two prominent perpetrators also were recently convicted and sentenced to prison for their roles.[7]

111.    Despite all the litigation and enforcement efforts, Defendants knowingly aided, abetted, facilitated, and profited from the usurious lending scheme as detailed below.

**C.    The basic structure of the tribal lending model is designed to conceal the role of the non-tribal participants, such as John Does 1-25.**

112.    The tribal lending model revolves around a series of agreements through which the tribe contractually relinquishes the right to control its lending entity.

113.    This is accomplished primarily through a document dubiously labeled a "servicing agreement."

114.    By way of one example, the Rosette law firm negotiated the terms of the tribal lending arrangement between Matt Martorello and a tribal company formed by the Lac Vieux Desert Band of Chippewa Indians in Michigan (the "LVD").

115.    Consistent with the tribal lending model, Rosette's client, Red Rock, received 2% of the net revenue from the loans in return for the use of its name. Ex. 1 at § 2.25.

---

[7] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

116.    By contrast, Martorello's company received the "revenue remaining" and reimbursement for all advances and expenses. *Id*. §§ 3.5.1.

117.    Additionally, under the servicing agreement, one of Martorello's companies, SourcePoint, was contractually entitled to exercise almost exclusive control over Red Rock's operations.

118.    Among other things, the servicing agreement provided SourcePoint with the exclusive "authority and responsibility over all communications and interaction whatsoever between" Red Rock and "each servicer provider, lender and other agents" involved in the business. *Id*. § 3.1.

119.    The non-tribal company also had the contractual right to "sweep [Red Rock's] bank account amounts into [SourcePoint's] bank accounts" to receive its share of the proceeds. *Id.* § 3.5.1.

120.    As explained in a sworn declaration from the Vice Chairwoman of the LVD: "[w]hen Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." Ex. 2 at ¶ 3.

121.    This declaration further that "[a]fter the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." *Id*. ¶ 4.

122. By way of another example, this same structure for a transaction between National Performance Agency ("NPA") and lending entities formed by the Habematolel Pomo of Upper Lake, a federally recognized Native American tribe ("Upper Lake").

123. Pursuant to a "Services Agreement" between NPA and Silver Cloud one of Upper Lake's lending entities, NPA agreed to provide essentially all services setup and run the lending operations, including: (1) personnel and equipment to receive and respond to incoming telephone calls, faxes, and emails from Silver Cloud's borrowers; (2) delivery of electronic files for all debits and credits to each borrowers' loan; (3) lead generation; (4) receipt and storage of application materials; (5) servicing of the loans, including collection of payments; and (6) delivery of information "to determine whether to fund the loans" and "credit such potential customers' accounts with the appropriate amounts" for debits and credits. Ex. 3 at 2264–65.

124. Additionally, nearly all of the revenue went to NPA and its partners, primarily through the use of "Participation Agreements."

125. Rather than being the direct lender, this "participation model" allowed NPA to purchase essentially all of the economic interests in the loan as detailed in NPA's Business Plan and Roadmap dated January 2012. Ex. 4 at 755 (explaining various "structural approaches to tribal deals," including a participation model "in which NPA purchases a 99% participation in the loans the tribe makes.").

126. The participation model, in other words, entitled NPA and its affiliated companies entitled to nearly all of the income and any profits from the loans while, at the same time, disguising its role and creating the façade that the loans were from a tribal government.

127. A similar setup was used for the enterprise between Think Finance and Great Plains, which used a similar structure of servicing and participation agreements. *See* Ex. 5.

128.    In addition to the servicing agreement, the tribal lending model involves the use of a loan and security agreement between the tribe and the payday lender.

129.    Typically, in exchange for the millions of dollars in capital to fund the illegal loans, these loan and security agreements require: (1) access to the books and records for each tribal lender; (2) monthly statements regarding the business (especially with respect to its credit and debits on loans); (3) deposit control agreements; (4) prioritized disbursements; (5) granting of a security interest in the loans; (6) restrictions on the use of the proceeds; (7) mandatory interest rates to be imposed on the loans to consumers; (8) servicing requirements for the collection of the loans, including the use of certain third parties; (9) prohibitions on the change of business policies; (10) rights to assume the business in the event of default on the repayment of the capital; and (11) waivers of sovereign immunity for the Tribe and its entities. *See generally* Ex. 6.

130.    According to a lawsuit filed by former employees, "Rosette has set up more than thirty payday loan enterprises at more than a dozen tribes." *Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Reservation*, 2018 WL 2734946, at *5 (S.D. Cal. June 7, 2018).

**D.    Defendants' tribal lending enterprise lends and collects money at rates that far exceed state usury laws.**

131.    In 2013, when the tribal lending model was emerging to replace the rent-a-bank model, the Tribe's Tribal Council enacted an ordinance establishing FreedomCashLenders.

132.    As early as July 3, 2013, consumers could obtain small-dollar loans from the website, www.freedomcashlenders.com, which is operated by FreedomCashLenders.

133.    According to its website, FreedomCashLenders is an "online payday lender" that consumers can "trust," with loan approval "within minutes."

134. Acording to its "FAQ" webpage, FreedomCashLenders loans anywhere from $300 up to $1,500 depending on the consumer's income and other lending criteria. According to its own website, the annual percentage rate charged on these loans ranges from 600-780%.

135. Similarly, in 2012, the Tribal Council enacted an ordinance establishing Tremont Lending, and consumers were able to obtain a loan from the website, www.tremontlending.com, starting on or around November 1, 2012.

136. According to its website, Tremont Lending offers "cash advance loan[s] (payday loan[s])" for "unexpected car repairs," "emergency medical or dental issues," "child's prescriptions," or "unexpected needs requiring fast cash." In other words, when a borrower was desperate and financially vulnerable, it could get cash from Tremont Lending "overnight."

137. Upon information and belief, Tremont Lending offers usurious loans on comparable terms to FreedomCashLenders, *i.e.*, loan amounts ranging from $300-$2,000 with annual percentage rates of 600-850%.

138. Similarly, within the past seven years, the Tribal Council enacted an ordinance establishing Little Lake Lending.

139. Based on Plaintiffs' experience and upon other information and belief, Little Lake Lending offers usurious loans on comparable terms to FreedomCashLenders and Tremont Lending, *i.e.*, loan amounts ranging from $300-$2,000 with annual percentage rates of 450-850%.

140. And within the past few years, the Tribal Council has enacted an ordinance establishing Credit Cube, which, based on Plaintiffs' experience and upon other information and belief, also offers loans ranging from $300-$2,000 with annual percentage rates of 450-850%.

**E.    The Tribal Council's role in the enterprise.**

141.    RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1691(4) (emphasis added).

142.    The Supreme Court's decision in *Boyle v. United States* recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

143.    Put differently, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.").

144.    Here, the Tribal Council and John Doe Defendants are an association in fact enterprise (the "Usurious Lending Enterprise") who are associated together for the common purpose of making, collecting, and profiting off the illegal loans issued by the TLEs.

145.    The Big Valley Band of Pomo Indians is a Native American tribal government that has been federally recognized since its treaty with the United States in 1851.

146.    The Tribe's reservation is located on approximately 120 miles north of the city of San Francisco.

147.    The Tribe's Tribal Council serves as its governing body and has the power to make laws and ordinances pursuant to the Tribe's Constitution and laws.

148.    The Tribe's Tribal Council is vested with significant power, including the power to create tribal businesses and negotiate with third parties to assist with those businesses.

149. Upon information and belief, the Tribal Council members have the authority to shut down the operations of Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders, including ceasing the collection of unlawful amounts from Plaintiffs and the putative class members.

150. Indeed, the TLEs are each a created by a tribal charter, issued in the name of the Tribal Council Defendants and easily revoked by them.

151. Upon information and belief, Defendants Flaman McCloud, Jr., Nick Jack, Aliya Ponce, and Vivian McCloud have been instrumental in facilitating the creation of the illegal lending business and each agreed to the collection of unlawful debt and conspired with the others herein to collect the unlawful debt from consumers.

152. Upon information and belief, Defendants Flaman McCloud, Jr., Nick Jack, Aliya Ponce, and Vivian McCloud have signed ordinances and participated in decisions with respect to the lending businesses—although it is likely that the vast majority of the day-to-day operations are outsourced to third parties who are not members of the Tribe.

153. Upon information and belief, Flaman McCloud, Jr., Nick Jack, Aliya Ponce, and Vivian McCloud have attended meetings related to the high-interest usurious loans offered by Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders, and have voted in favor of their making and collection of the usurious loans.

154. Although the Tribe hold itself out as the actual lender of these internet loans, a substantial amount of the money comes from third party investors who enter into servicing and loan and security agreements with the Tribe, which must be approved by the Tribal Council.

155. Typically, in exchange for the millions of dollars in capital to fund the illegal loans, these loan and security agreements require: (1) access to the books and records for each tribal

lender; (2) monthly statements regarding the business (especially with respect to its credit and debits on loans); (3) deposit control agreements; (4) prioritized disbursements; (5) granting of a security interest in the loans; (6) restrictions on the use of the proceeds; (7) mandatory interest rates to be imposed on the loans to consumers; (8) servicing requirements for the collection of the loans, including the use of certain third parties; (9) prohibitions on the change of business policies; (10) rights to assume the business in the event of default on the repayment of the capital; and (11) waivers of sovereign immunity for the Tribe and its entities.

156.    Through their participation in the lending enterprise, as well as their knowing facilitation of the scheme, Defendants have violated RICO, as well as state usury and consumer protection laws.

**F.    Plaintiffs were charged usurious interest on their loans.**

157.    Defendants—together with others not yet known to Plaintiffs—marketed, initiated, and collected usurious loans throughout the country, including in Maryland, the District of Columbia, New Mexico, Florida, California, Iowa, Ohio, Arizona, South Carolina, and Texas, as well as other states with similar usury protections.

158.    Defendants knew the loans were illegal under state usury and licensing laws, but they pursued the scheme anyway.

159.    They charged astronomical interest rates that far exceeded the rates allowed by applicable state laws.

160.    Upon information and belief and based on Plaintiffs' experience, all of Defendants' loans to consumers used excessive interest rates far in excess of applicable state laws.

161.    Accordingly, the loans were and are null and void under applicable state law, and it is unlawful for Defendants, Little Lake Lending, Credit Cube, Green Arrow Solutions, and

32

FreedomCashLenders, or any of their yet-to-be-identified non-tribal coconspirators to collect or receive any interest (or even principal in some states like Maryland) or other charges on said loans, including any amounts paid by Plaintiffs.

### 1. Plaintiff Keira Williams

162. For example, in August 2025, Plaintiff Keira Williams received a loan from Little Lake in the amount of $900, which had an interest rate of 795%.

163. Plaintiff Williams repaid more than she borrowed on this loan.

164. Plaintiff Williams used her Maryland address when applying for the loans, and she used her Maryland  bank account with a Maryland ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

### 2. Plaintiff Casey Cook

165. Plaintiff Casey Cook obtained a loan from Little Lake in August 2025 for $2,000, which had an interest rate of 500%.

166.  Plaintiff Cook has made payments on this loan.

167. Plaintiff Cook used her D.C. address on her loan application, and she used her D.C. bank account to receive the loans and for the subsequent ACH debits made to pay down the loans.

### 3. Plaintiff Leroy Cardona

168. In November 2025, Plaintiff Leroy Cardona applied for and received a $800 loan from Little Lake Lending.

169. This loan imposed an interest rate of 750%, requiring repayment of more than $4,000 over approximately 8 months.

170. Plaintiff Cardona has repaid at least $1,310.90 on his loan.

171. Plaintiff Cardona used his New Mexico address on his loan application, and he used his New Mexico bank account with a New Mexico ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

**4.      Plaintiff Zachary Miles**

172. Plaintiff Miles applied for and obtained two loans from Little Lake in November 2025 and January 2026, respectively, each of which was for less than $1,000 and had an interest rate of at least 750%.

173. Plaintiff Miles repaid more than he borrowed on his 2025 loan.

174. For each loan, Plaintiff Miles used his Florida address on his loan application, and he used his Florida bank account with a Florida ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

**5.      Plaintiff Julian Griffin**

175. Plaintiff Griffin applied for and obtained a loan from Credit Cube in 2023 for $2,000, which had an interest rate of 389.94%.

176. Plaintiff Griffin repaid more than he borrowed on his loan from Credit Cube.

177. For his loan, Plaintiff Griffin used his Florida address on his loan application, and he used his Florida bank account with a Florida ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

**6.      Plaintiff Nia Johnson**

178. In December 2023, Plaintiff Johnson applied for and received a $500 loan from Credit Cube, which imposed a 655% interest rate.

179. Plaintiff Johnson paid more than she borrowed on this loan.

180. Plaintiff Johnson used her California address on her loan application, and she used her California bank account with an California ABA routing number to receive the loans and for the subsequent ACH debits to pay down the loans.

### 7. Plaintiff Twesha Patel

181. In April 2024, Plaintiff Patel applied for and received a $1,500 loan from Little Lake, which had an interest rate of 795%.

182. Plaintiff Patel made payments on her loan.

183. Plaintiff Patel used her California address on her loan application, and she used her California bank account with an California ABA routing number to receive the loans and for the subsequent ACH debits to pay down the loans.

### 8. Plaintiff Jeffrey Moffitt

184. Plaintiff Moffitt received two loans from Little Lake.

185. Both loans had triple-digit interest rates.

186. Plaintiff Moffitt repaid more than he borrowed on at least one of these loans.

187. For each loan, Plaintiff Moffitt used his Iowa address when applying for the loans, and he used his Iowa bank account with an Iowa ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

### 9. Plaintiff Scott Elliott

188. Plaintiff Elliott received a loan from Little Lake for $1,000, which had an interest rate of 794%.

189. Plaintiff Elliott made payments on this loan.

190. Plaintiff Elliott used his Ohio address when applying for his loan, and he used his Ohio bank account with an Ohio ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

**10.   Plaintiff Jacob Bute**

191. Plaintiff Bute obtained a loan from Little Lake in 2026 for $700, which had an interest rate of 795%.

192. Plaintiff Bute used his Arizona address when applying for the loan, and he used his Arizona bank account with an Arizona ABA routing number to receive the loan.

**11.   Plaintiff Josephine Gorruso**

193. Plaintiff Josephine Gorruso received two loans from Little Lake in 2024 and 2025, each of which had interest rates over 300%.

194. Plaintiff Gorruso repaid thousands of dollars on her loans, including more than she borrowed, in violation of South Carolina law.

195. For each loan, Plaintiff Gorruso used her South Carolina address when applying for the loans, and she used her South Carolina bank account with a South Carolina ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

**12.   Plaintiff Jerry Rice**

196. Plaintiff Rice received a loan from Little Lake in 2025 for $1,100, which had an interest rate of 500%.

197. Plaintiff Rice repaid more than he borrowed on this loan, totaling over $2,000 in payments, in violation of South Carolina law.

198.    For his loan, Plaintiff Rice used his South Carolina address when applying for the loan, and he used his South Carolina bank account with a South Carolina ABA routing number to receive the loan proceeds and for the subsequent ACH debits made to pay down the loan.

### 13.    Plaintiff Mario Cochran

199.    Plaintiff Cochran obtained a loan from Little Lake in October 2025 for $1,000.

200.    The loan issued to Plaintiff Cochran had an interest rate of 500%.

201.    Plaintiff Cochran repaid more than $2,000 on this loan, including usurious interest.

202.    Plaintiff Cochran used his Texas address when applying for his loan, and he used his Texas bank account with a Texas ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

### 14.    Plaintiff Sharon Voss

203.    Plaintiff Voss obtained a $500 loan from Little Lake in 2023 that had an interest rate of 300%.

204.    Plaintiff Voss repaid more than she borrowed on this loan.

205.    Plaintiff Voss used her Arizona address when applying for the loan, and she used her Arizona bank account with a Arizona ABA routing number to receive the loan proceeds and for the subsequent ACH debits made to pay down the loan.

\* \* \*

206.    As outlined above, the loans issued to Plaintiffs violated the respective usury statutes of each of their home states and entitle Plaintiffs to the remedies provided under their respective state laws, including avoidance of the loans and repayment, at a minimum, of interest paid above the usury caps, if not principal and interest entirely, as well as exemplary damages.

207.    Similarly, almost all other state jurisdictions treat as illegal unlicensed small loans like those involved here.[8]

208.    Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and collect the loans at issue in this case, which have victimized hundreds of thousands of consumers on terms similar to Plaintiffs.

---

[8] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

**COUNT ONE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM: ALL PLAINTIFFS EXCEPT PLAINTIFF BUTE AGAINST ALL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES ONLY)**

209.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

210.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs (except Plaintiff Bute) bring this action for themselves and on behalf of a class (the "RICO Class"), initially defined as:

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and/or FreedomCashLenders; (2) while located in the District of Columbia or any state other than Utah or Nevada; and (3) paid any amounts on their loan.

211.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs (except Plaintiff Bute, Johnson, and Griffin) bring this action for themselves and on behalf of a subclass (the "RICO Little Lake Subclass"), initially defined as:

> All individuals who: (1) entered into a loan agreement with Little Lake Lending; (2) while located in the District of Columbia or any state other than Utah or Nevada; and (3) paid any amounts on their loan.

212.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Johnson and Griffin bring this action for themselves and on behalf of a subclass (the "RICO Credit Cube Subclass"), initially defined as:

> All individuals who: (1) entered into a loan agreement with Credit Cube; (2) while located in the District of Columbia or any state other than Utah or Nevada; and (3) paid any amounts on their loan.

213.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by similar cases against others in the industry, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are

39

identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

214. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an "enterprise" under RICO existed; (2) whether Defendants conducted or participated in the enterprise's affairs; (3) whether the loans are "unlawful debt" for purposes of RICO; and (4) what is the proper recovery for Plaintiffs and the class members against each Defendant.

215. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

216. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

217. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action

is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

218.    All of the loans made to consumers throughout the United States (except Utah and Nevada), included an interest rate far in excess of twice the enforceable rate in the consumers' respective states of residence.

219.    As alleged above, Defendants associated with an enterprise (the Usurious Lending Enterprise) that existed for the purpose of collection of unlawful debt, agreed that the enterprise would engage in the collection of unlawful debt, and participated in the affairs of the enterprise.

220.    Defendants' participation in the Usurious Lending Enterprise violated § 1962(c) of RICO and caused Plaintiffs and the RICO Class members to repay amounts on unlawful loans.

221.    Plaintiffs and the RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest and principal on loans made by the Usurious Lending Enterprise which would not have been made but for Defendants' conduct.

222.    Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

223.    Alternatively, pursuant to Rule 8 of the Federal Rules of Civil Procedure, Plaintiffs and the RICO Little Lake Subclass allege that there is an association-in-fact enterprise comprised of the Tribal Council Defendants and the John Doe Defendants who invested in, operated, and reaped the benefits of the Little Lake lending front (the "Little Lake Enterprise"), and who are therefore liable to at least the RICO Little Lake Subclass members for their respective roles in operating and carrying out the affairs of the Little Lake Enterprise.

224.    Accordingly, pursuant to 18 U.S.C. § 1964(c), and in the alternative to the claim asserted by the RICO Class, Plaintiffs and the RICO Little Lake Subclass seek their actual damages, treble damages, costs, and attorneys' fees from the Tribal Council Defendants and the John Doe Defendants who participated in the Little Lake Enterprise.

225.    Pursuant to Rule 8, in the alternative to the Usurious Lending Enterprise defined above, Plaintiff Johnson and the RICO Credit Cube Subclass allege that there is an association-in-fact enterprise comprised of the Tribal Council Defendants and the John Doe Defendants who invested in, operated, and reaped the benefits of the Credit Cube lending front (the "Credit Cube Enterprise"), and who are therefore liable to at least the RICO Credit Cube Subclass members for their respective roles in operating and carrying out the affairs of the Credit Cube Enterprise.

226.    Accordingly, pursuant to 18 U.S.C. § 1964(c), and in the alternative to the claim asserted by the RICO Class, Plaintiff Johnson and the RICO Credit Cube Subclass seek their actual damages, treble damages, costs, and attorneys' fees from the Tribal Council Defendants and the John Doe Defendants who participated in the Credit Cube Enterprise.

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM: ALL PLAINTIFFS EXCEPT PLAINTIFF BUTE AGAINST ALL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES ONLY)**

227.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

228.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs (except Plaintiff Bute) bring this action on behalf of the same RICO Class and RICO Subclasses as Count One.

229.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by similar cases against others in the industry, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

230.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an "enterprise" under RICO existed; (2) whether there was a conspiracy to collect unlawful debt; (3) at what point each defendant joined the conspiracy; (4) whether the loans are "unlawful debt" for purposes of RICO; and (5) what is the proper recovery for Plaintiffs and the class members against each Defendant.

231.    **Typicality. Fed. R. Civ. P. 23(a)(3)**. Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

232. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4)**. Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

233. As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to conspire to violate §§ 1962(b)-(c), including but not limited to: (1) various loan and security agreements with third party investors; (2) agreements related to the purchasing of shares with respect to the unlawful loans; and (3) authorization of the usurious loan agreements entered into with Plaintiffs and other class members.

234. Defendants conspired and agreed to advance a RICO undertaking and caused Plaintiffs to repay amounts on unlawful loans.

235. Plaintiffs and the class and subclass members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the Usurious Lending Enterprise, and/or the Little Lake Enterprise and Credit Cube Enterprise, respectively, in the same manner and to the same extent as pled in the alternative in Count One.

**COUNT THREE:**
**VIOLATIONS OF MARYLAND CONSUMER LOAN LAW,**
**MD. CODE, COM. L. § 12-314**
**(CLASS CLAIM BY PLAINTIFF WILLIAMS FOR INJUNCTIVE RELIEF AGAINST**
**THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)**

236. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

237. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Williams brings this claim for herself and on behalf of a class initially defined as follows (the "Maryland Injunctive Class"):

All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and/or FreedomCashLenders; (2) while located in Maryland; and (3) have an outstanding balance on their loan(s).

238. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

239. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

240. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

241. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1)

45

whether Defendants obtained a license to lend in Maryland; (2) whether Defendants' loans violate Maryland's licensing requirements; (3) whether Defendants' loans violate Maryland's usury laws because the interest rates were too high; (4) whether and to what extent Plaintiffs are entitled to injunctive relief.

242. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

243. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

244. Upon information and belief, the loans issued to Plaintiff Williams and the class members were for less than $25,000.

245. Under Maryland law, Defendants and the TLEs were required to obtain a license to issue small-dollar loans to Maryland consumers.

246. Despite these requirements, Defendants and the TLEs issued to Plaintiff Williams and the putative class members loans without a license and well in excess of Maryland's usury interest rate cap.

247. Because Defendants failed to obtain a license and charged excessive interest rates, the loans are void and unenforceable under Maryland law, and Defendants are prohibited from collecting, "directly or indirectly," any amounts on the loans. Md. Code, Com. L. § 12-314.

248. Plaintiff Williams and the class members are likely to be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined in their official capacities.

249. Accordingly, Plaintiff Williams and the putative class members are entitled to injunctive relief against the Tribal Council Defendants, in their official capacities, enjoining the further collection of any amounts on the loans issued to them by the TLEs.

## COUNT FOUR:
## VIOLATIONS OF D.C. CODE § 28-3301, *ET SEQ.*
### (CLASS CLAIM BY PLAINTIFF COOK FOR INJUNCTIVE RELIEF AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)

250. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

251. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Cook brings this claim for herself and on behalf of a class initially defined as follows (the "D.C. Injunctive Class"):

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and/or FreedomCashLenders; (2) while located in the District of Columbia; and (3) have an outstanding balance on their loan(s).

252.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

253.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

254.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

255.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate D.C.'s usury laws; and (2) whether and to what extent Plaintiffs are entitled to injunctive relief.

256.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action

48

is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

257. **Injunctive Relief Appropriate for the Class.** **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

258. Upon information and belief, the loans issued to Plaintiff Cook and the class members had interest rates exceeding 24 percent per annum.

259. The loans issued to Plaintiff Cook and the class members were thus usurious under D.C. Code Ann. § 28-3301 and 28-3303, and Defendants have forfeited any right to the interest on Plaintiff Cook's and the class members' loans.  D.C. Code Ann. § 28-3314

260. Plaintiff Cook and the class members are likely to be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined in their official capacities.

261.     Accordingly, Plaintiff Williams and the putative class members are entitled to injunctive relief against the Tribal Council Defendants, in their official capacities, enjoining the further collection of any interest of their loans.

**COUNT FIVE:**
**VIOLATIONS OF NEW MEXICO BANK INSTALLMENT LOAN ACT OF 1959,**
**N.M. STAT. § 58-7-8; N.M. STAT. § 57-12-10**
**(CLASS CLAIM BY PLAINTIFF CARDONA FOR INJUNCTIVE RELIEF AGAINST**
**THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)**

262.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

263.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Cardona brings this claim for himself and on behalf of a class initially defined as follows (the "New Mexico Injunctive Class"):

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and/or FreedomCashLenders; (2) while located in New Mexico; and (3) have an outstanding balance on their loan(s).

264.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

265.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

266.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel

50

competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

267.    **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate New Mexico's Bank Installment Loan Act; and (2) whether and to what extent Plaintiffs are entitled to injunctive relief.

268.    **Superiority.** **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

269.    **<u>Injunctive Relief Appropriate for the Class</u>.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

270.    Upon information and belief, the loans issued to Plaintiff Williams and the class members were each for less than $5,000, rendering them subject to the New Mexico Bank Installment Loan Act of 1959.

271.    Under that Act, Defendants and the TLEs could not issue loans with interest rates more than 36 percent.

272.    Despite these requirements, Defendants and the TLEs issued to Plaintiff Cardona and the putative class members loans well in excess of New Mexico's usury interest rate cap.

273.    Because Defendants charged excessive interest rates, the loans are void and unenforceable under the Bank Installment Loan Act of 1959, and Defendants, in the offical capacities through which they control the TLEs, "ha[ve] no right to collect, receive, or retain any interest or charges whatsoever" on the loans.  N.M. Stat. § 58-7-8(A).

274.    Defendants' violations of the New Mexico Bank Installment Loan Act of 1959 further constitute a violation of the New Mexico Unfair Trade Practices Act, entitling Plaintiff Cardona and the class members to an injunction against the continued collection or issuance of loans in New Mexico that do not comply with state law.  N.M. Stat. §§ 58-7-8(C), 57-12-10.

275.    Plaintiff Cardona and the class members are likely to be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined in their official capacities.

276. Accordingly, Plaintiff Cardona and the putative class members are entitled to injunctive relief against the Tribal Council Defendants, in their official capacities, enjoining the further collection of any amounts on the loans issued to them by the TLEs.

**COUNT SIX:**
**VIOLATIONS OF FLORIDA CONSUMER FINANCE ACT,**
**FLA. STAT. § 516.001, *ET SEQ.***
**(CLASS CLAIM BY PLAINTIFFS MILES AND GRIFFIN FOR INJUNCTIVE RELIEF**
**AGAINST THE TRIBAL COUNCIL DEFENDANTS**
**IN THEIR OFFICIAL CAPACITIES)**

277. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

278. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Miles and Griffin bring this claim for themselves and on behalf of a class initially defined as follows (the "Florida Injunctive Class"):

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and/or FreedomCashLenders; (2) while located in Florida; and (3) have an outstanding balance on their loan(s).

279. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

280. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

281. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic

to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

282.    **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate Florida Consumer Finance Act; and (2) whether and to what extent Plaintiffs are entitled to injunctive relief.

283.    **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

284.    **<u>Injunctive Relief Appropriate for the Class</u>.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

285.    The Tribal Council Defendants violated the Florida Consumer Finance Act by engaging in the business of making consumer finance loans within Florida without a license or other authorization under Florida law to do so.

286.    Neither the Tribal Council Defendants, nor any John Doe Defendant or TLE, ever obtained a license to issue consumer loans within Florida.

287.    In addition to failing to obtain a license, Defendants also issued loans to Plaintiffs Miles and Griffin and the class members with interest rates far exceeding 18 percent, in further violation of the Florida Consumer Finance Act.

288.    Because Defendants charged excessive interest rates on consumer loans that they issued without a license under Florida law, the loans are void and unenforceable under the Florida Consumer Finance Act, and Defendants, in the official capacities through which they control the TLEs, have not right to collect on the loans.

289.    Plaintiffs Miles and Griffin and the class members are likely to be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined in their official capacities.

290.    Accordingly, Plaintiffs Miles and Griffin and the putative class members are entitled to injunctive relief against the Tribal Council Defendants, in their official capacities, enjoining the further collection of any amounts on the loans issued to them by the TLEs.

**COUNT SEVEN:**
**VIOLATIONS OF CALIFORNIA FINANCING LAW,**
**CAL. FIN. CODE § 22000, *ET SEQ.***
**(CLASS CLAIM BY PLAINTIFFS JOHNSON AND PATEL FOR INJUNCTIVE RELIEF**
**AGAINST THE TRIBAL COUNCIL DEFENDANTS**
**IN THEIR OFFICIAL CAPACITIES)**

291.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

292.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Johnson and Patel brings this claim for themselves and on behalf of a class initially defined as follows (the "California Injunctive Class"):

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and/or FreedomCashLenders; (2) while located in California; and (3) have an outstanding balance on their loan(s).

293.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

294.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

295.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of

the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

296.    **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate California Financing Law; (2) whether those violations were willful; and (3) whether and to what extent Plaintiffs are entitled to injunctive relief.

297.    **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

298.    **Injunctive Relief Appropriate for the Class**.  **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class

members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

299. Upon information and belief, the Tribal Council Defendants, through their official control over and creation of the TLEs, willfully issued loans to Plaintiffs Johnson and Patel and the class members that contracted for interest well in excess of the usury cap under the California Financing Law.

300. They further willfully violated the California Financing Law by knowingly disregarding the requirement that they first obtain a license to issue consumer loans.

301. Indeed, as members and leaders of a Tribe based in California, the Tribal Council Defendants were aware or should have known that California requires lenders to first obtain a license before issuing consumer loans like those issued by the TLEs in this case.  They also knew that California capped the interest rate on such loans.

302. Despite this knowledge, the Tribal Council Defendants created, approved, and continued the operations of the TLEs—which would not exist or continue to operate but for their sanction—including the ongoing collection of the loans issued to Plaintiff Johnson and the class members.

303. Defendants' willful violations of the California Financing Law render the loan contracts entered with Plaintiff Johnson and the class members void, and "no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction." Cal. Fin. Code § 22750(a) and (b).

304. Plaintiffs Johnson and Patel and the class members are likely to be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined in their official capacities.

305. Accordingly, Plaintiffs Johnson and Patel and the putative class members are entitled to injunctive relief against the Tribal Council Defendants, in their official capacities, enjoining the further collection of any amounts on the loans issued to them by the TLEs.

**COUNT EIGHT:**
**VIOLATIONS OF IOWA USURY LAWS,**
**IOWA STAT. § 535.4**
**(CLASS CLAIM BY PLAINTIFF MOFFITT FOR INJUNCTIVE RELIEF AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)**

306. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

307. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Moffitt brings this claim for himself and on behalf of a class initially defined as follows (the "Iowa Injunctive Class"):

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and/or FreedomCashLenders; (2) while located in Iowa; and (3) have an outstanding balance on their loan(s).

308. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

309. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

310. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel

59

competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

311.   **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate Iowa's usury statutes; and (2) whether and to what extent Plaintiffs are entitled to injunctive relief.

312.   **Superiority.** **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

313.   **Injunctive Relief Appropriate for the Class.**   **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

314.   Upon information and belief, the Tribal Council Defendants, through their official control over and creation of the TLEs, issued loans to Plaintiff Moffitt and the class members that far exceeded Iowa's applicable usury rate cap at the time the respective loans were issued.

315.   Under Iowa law, "[n]o person shall, directly or indirectly, receive in money or in any other thing, or in any manner, any greater sum or value for the loan of money" beyond the usurious interest rate limit applicable to each class member's loan at the time of issuance.

316.   Plaintiff Moffitt and the class members are likely to be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined in their official capacities.

317.   Accordingly, Plaintiff Moffitt and the putative class members are entitled to injunctive relief against the Tribal Council Defendants, in their official capacities, enjoining the further collection and receipt of any amounts on the subject loans beyond the those permitted under Iowa law.

**COUNT NINE:**
**VIOLATIONS OF OHIO SMALL LOANS ACT,**
**OHIO REV CODE ANN. § 1321.01, *ET SEQ.***
**(CLASS CLAIM BY PLAINTIFF ELLIOTT FOR INJUNCTIVE RELIEF AGAINST**
**THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)**

318.   Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

319.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Elliott brings this claim for himself and on behalf of a class initially defined as follows (the "Ohio Injunctive Class"):

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and/or FreedomCashLenders; (2) while located in Ohio; and (3) have an outstanding balance on their loan(s).

320.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

321.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

322.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

323.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1)

whether Defendants' loans violate the Ohio Small Loans Act; and (2) whether and to what extent Plaintiffs are entitled to injunctive relief.

324. **<u>Superiority</u>. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

325. **<u>Injunctive Relief Appropriate for the Class</u>. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

326. Upon information and belief, the loans issued to Plaintiff Elliott and the class members were each for $5,000 or less.

327. Neither the Tribal Council Defendants, nor any John Doe Defendant or TLE, ever obtained a license to issue loans for $5,000 or less within Ohio.

328.    In addition to failing to obtain a license, Defendants also issued loans to Plaintiff Elliott and the class members with interest rates far exceeding Ohio's general usury rate cap of 8 percent.

329.    Because Defendants and the TLEs charged excessive interest rates on small dollar loans that they issued without a license under Ohio law, the loans are void and unenforceable, and the Tribal Council Defendants, through their control over the TLEs, "have no right to collect, receive, or retain any principal, interest, or charges" on the loans.

330.    Plaintiff Elliott and the class members are likely to be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined in their official capacities.

331.    Accordingly, Plaintiff Elliott and the putative class members are entitled to injunctive relief against the Tribal Council Defendants, in their official capacities, enjoining the further collection of any amounts on the loans issued to them by the TLEs.

**COUNT TEN:**
**VIOLATIONS OF ARIZONA USURY LAWS,**
**AZ STAT. § 44-1201,** *ET SEQ.*
**(CLASS CLAIM BY PLAINTIFFS BUTE AND VOSS FOR INJUNCTIVE RELIEF**
**AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL**
**CAPACITIES)**

332.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

333.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Bute and Voss bring this claim for themselves and on behalf of a class initially defined as follows (the "Arizona Injunctive Class"):

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and/or FreedomCashLenders; (2) while located in Arizona; and (3) have an outstanding balance on their loan(s).

64

334.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

335.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

336.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

337.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate Arizona usury laws; and (2) whether and to what extent Plaintiffs are entitled to injunctive relief.

338.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action

is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

339.    **Injunctive Relief Appropriate for the Class.**  **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

340.    Upon information and belief, the Tribal Council Defendants, through their official control over and creation of the TLEs, issued loans to Plaintiffs Bute and Voss and the class members that far exceeded Arizona's usury interest rate cap of 10 percent.

341.    The loans issued to Plaintiffs Bute and Voss and the class were therefore usurious under Arizona law, and the Tribal Council Defendants, through their control of the TLEs, "shall forfeit all interest" on the loans.  Az Stat. § 44-1202.

342.    Plaintiffs Bute and Voss and the class members are likely to be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined in their official capacities.

343.    Accordingly, Plaintiffs Bute and Voss and the putative class members are entitled to injunctive relief against the Tribal Council Defendants, in their official capacities, enjoining the further collection and receipt of any interest on their usurious loans.

**COUNT ELEVEN:**
**VIOLATIONS OF SOUTH CAROLINA CONSUMER FINANCE LAW,**
**S.C. CODE § 34-29-10, *ET SEQ.***
**(CLASS CLAIM BY PLAINTIFFS GORRUSO AND RICE FOR INJUNCTIVE RELIEF**
**AGAINST THE TRIBAL COUNCIL DEFENDANTS**
**IN THEIR OFFICIAL CAPACITIES)**

344.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

345.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Gorruso and Rice bring this claim for themselves and on behalf of a class initially defined as follows (the "South Carolina Injunctive Class"):

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and/or FreedomCashLenders; (2) while located in South Carolina; and (3) have an outstanding balance on their loan(s).

346.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

347. **<u>Typicality</u>. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

348. **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

349. **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate South Carolina's Consumer Finance Law; and (2) whether and to what extent Plaintiffs are entitled to injunctive relief.

350. **<u>Superiority</u>. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized

litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

351. **Injunctive Relief Appropriate for the Class.** **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

352. Upon information and belief, the Tribal Council Defendants, through their official control over and creation of the TLEs, issued loans to Plaintiffs Gorruso and Rice and the class members that far exceeded South Carolina's usury cap of 8.75 percent. Upon information and belief, each loan was also for less than $7,500.

353. Neither the Tribal Council Defendants nor the TLEs or any individual or entity associated with the same obtained a license to issue loans for less than $7,500 to consumer located in South Carolina, including Plaintiffs Gorruso and Rice.

354. Due to Defendants' violations of South Carolina law, the loans issued to Plaintiffs Gorruso and Rice and the class members are void, and the Tribal Council Defendants, through their control of the TLEs, "have no right to collect, receive or retain any principal, interest or charges whatsoever" on the loans.

355. Plaintiffs Gorruso and Rice and the class members are likely to be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined in their official capacities.

356. Accordingly, Plaintiffs Gorruso and Rice and the putative class members are entitled to injunctive relief against the Tribal Council Defendants, in their official capacities, enjoining the further collection and receipt of any amounts on their loans.

## COUNT TWELVE:
## VIOLATIONS OF TEXAS USURY LAWS,
## TEX. FIN. CODE § 302.001, *ET SEQ.*
## (CLASS CLAIM BY PLAINTIFF COCHRAN FOR INJUNCTIVE RELIEF AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)

357. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

358. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Cochran brings this claim for himself and on behalf of a class initially defined as follows (the "Texas Injunctive Class"):

> All individuals who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and/or FreedomCashLenders; (2) while located in Texas; and (3) have an outstanding balance on their loan(s).

359. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

360. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

361.    **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

362.    **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate Texas's usury rate cap; and (2) whether and to what extent Plaintiffs are entitled to injunctive relief.

363.    **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the

litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

364.   **Injunctive Relief Appropriate for the Class.**   **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

365.   Upon information and belief, the Tribal Council Defendants, through their official control over and creation of the TLEs, issued loans to Plaintiff Cochran and the class members that far exceeded Texas's usury rate cap of 10 percent.

366.   Accordingly, the loans issued to Plaintiff Cochran and the class members are each "contrary to public policy" under Texas law and unenforceable.  Tex. Fin. Code § 302.001.

367.   Plaintiff Cochran and the class members are likely to be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined in their official capacities.

368.   Accordingly, Plaintiff Cochran and the putative class members are entitled to injunctive relief against the Tribal Council Defendants, in their official capacities, enjoining the further collection and receipt of any amounts on their loans.

**COUNT THIRTEEN:**
**DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201**
**(CLASS CLAIM BY ALL PLAINTIFFS EXCEPT COOK, MOFFITT, AND ELLIOTT**
**AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL**
**CAPACITIES ONLY)**

369.   Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

370. Pursuant to Rule 8(d)(2), Plaintiffs allege that, in the alternative to the prospective relief available under state law, a declaratory judgment is available under 28 U.S.C. § 2201.

371. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs (except Cook, Moffitt, and Elliott) bring this claim for themselves and on behalf of the "Void Debt Class" initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders; (2) from Maryland, Virginia, Georgia, Florida, Alabama, Arizona, Arkansas, California, Connecticut, North Carolina, Idaho, Illinois, Kansas, Minnesota, New York, New Mexico, Oregon, Rhode Island, South Dakota, South Carolina, Texas, West Virginia, or Wisconsin; and (3) have an outstanding balance on their loan(s).

372. Maryland, Virginia, Georgia, Florida, Alabama, Arizona, Arkansas, California, Connecticut, North Carolina, Idaho, Illinois, Kansas, Minnesota, New York, New Mexico, Oregon, Rhode Island, South Dakota, South Carolina, Texas, West Virginia, or Wisconsin have licensing or usury laws that require a lender to be licensed and/or cap interest rates.

373. Little Lake Lending, Credit Cube, Green Arrow Solutions, and FreedomCashLenders were not licensed to make loans in Maryland, Virginia, Georgia, Florida, Alabama, Arizona, Arkansas, California, Connecticut, North Carolina, Idaho, Illinois, Kansas, Minnesota, New York, New Mexico, Oregon, Rhode Island, South Dakota, South Carolina, Texas, West Virginia, or Wisconsin.

374. Because the loans were made without the required license and/or charged excessive interest rates, the loans are null and void.

375. Plaintiffs and members of the class are subject to ongoing harm absent a declaration that the loans were void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

376. The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice of law and forum-selection provisions.

377. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

378. Accordingly, Plaintiffs seek a declaratory judgment that the loan agreements are invalid and the loans are uncollectable. Plaintiffs also seek to enjoin the Tribal Council Defendants, in their official capacities, from allowing collection on the loans.

<b><u>PRAYER FOR RELIEF</u></b>

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment for themselves and the classes and subclasses they seek to represent against Defendants, including for:

A. Certification of this matter to proceed as a class action;

B. Declaratory, injunctive, and compensatory relief as pled herein;

C. Attorney's fees, litigation expenses, and costs of suit; and

D. Any further relief the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By: ___/s/ Kristi C. Kelly___
Kristi C. Kelly, Esq., Md. Bar # 07244
Andrew J. Guzzo, Esq., *pro hace vice forthcoming*
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com